STATE *v.* C. C. NORVELL *et al.**

(*Nashville.*   December Term, 1916.)

1. HEALTH. Police power. Vital Statistics law.

The Vital Statistics Law (Acts 1913, chapter 30), requiring under-
takers to secure burial permit by filing complete certificate of
death, etc., is a valid exercise of the State's police power, tending
to promote the safety, health, and well-being of the community.
(*Post, p.* 93.)

Acts cited and construed:   Acts 1913, ch. 30.

2. CONSTITUTIONAL LAW. Personal privileges and liberty.
Vital statistics law.

This statute does not violate Const. article 1, section 8, providing
that no man shall be taken or imprisoned or disseised of his
freehold, liberties, or privileges, or outlawed or exiled, or in
any manner destroyed or deprived of his life, liberty, and prop-
erty, but by the judgment of his peers or the law of the land;
the statute being an exercise of the State's police power. (*Post,
pp.* 93, 94.)

Cases cited and approved:   Washington v. Mayor of Nashville,
31 Tenn., 180; Wright v. State, 50 Tenn., 256; House v. Whitis,
64 Tenn., 692; Theilan v. Porter, 82 Tenn., 622; Henley v. State, 98
Tenn., 665; Webster v. State, 110 Tenn., 491; Morrison v.
State, 116 Tenn., 534; Motlow v. State, 125 Tenn., 547.

Constitution cited and construed:   Sec. 8, art. 1.

3. EMINENT DOMAIN. Taking property. Vital statistics law.

Nor does it violate Const. article 1, section 21, providing that no
man's particular services shall be demanded or property taken
or applied to public use without the consent of his representa-
tives or without just compensation being made therefor;   the
statute being an exercise of the State's police power. (*Post,
pp.* 93, 94.)

4. CONSTITUTIONAL LAW. Fifth amendment. Restriction of
federal powers alone.

The power of the Federal government alone are restricted by
Const. U. S. Amend. 5.   (*Post, pp.* 94, 95.)

*On constitutionality of statutes in relation to vital statistics see
note in 39 L. R. A. (N. S.), 1015.

State v. Norvell.

Cases cited and approved: Kelly v. Pittsburg, 104 U. S., 78; Livingston v. Moore, 7 Pet., 469; Barron, for Use, v. Baltimore, 7 Pet., 243.

5. **CONSTITUTIONAL LAW.** Constitutional restriction of federal government.

The first ten amendments of Const. U. S. do not apply to the States, but are restrictions upon the power of the Federal government alone. (*Post, pp.* 94, 95.)

6. **CONSTITUTIONAL LAW.** Fourteenth amendment. Vital statistics law.

Vital Statistics Law, requiring undertakers to procure burial permit and death certificate, and make report of death without medical attendance, etc., does not violate Const. U. S. Amend. 14. (*Post, p.* 95.)

7. **HEALTH.** Regulation. Reasonableness. Vital statistics law.

Vital Statistics Law, requiring certain reports, etc., of undertakers, is not invalid as unreasonable or arbitrary, or imposing an undue burden on the undertakers, since it will be construed as not requiring impossibilities; but where the undertaker is unable to secure the statutory information after diligent effort, and a burial permit is refused him, he will not be punished for proceeding with the disposition of the body, notwithstanding such wrongful refusal. (*Post, pp.* 95-98.)

Cases cited and approved: Robinson v. Hamilton, 60 Iowa, 134; Commonwealth v. McConnell, 116 Ky., 358; State v. Boone, 84 Ohio St., 346.

8. **STATUTES.** Title. Vital Statistics law.

The Vital Statistics Law, entitled "An act to provide an effective system for the keeping of records of all births and deaths in Tennessee, and to provide penalties for the violation of this act," does not violate Const. article 2, section 17, as being broader than its title. (*Post, p.* 98.)

Constitution cited and construed: Art. 2, sec. 17.

FROM GRUNDY.

Error to the Circuit Court of Grundy County.—
FRANK L. LYNCH, Judge.

NEAL L. THOMPSON, Assistant Attorney-General, for
the State.

C. H. GARNER and T. J. KING, for defendants in er-
ror.

MR. JUSTICE GREEN delivered the opinion of the
court.

The defendants in error, undertakers, doing busi-
ness in Tracy City, were indicted for handling and re-
moving a dead body from the Fourth civil district of
Grundy county without a permit for the removal of
the said body. The indictment was based on chapter
30 of the Acts of 1913, known as the "Vital Statistics
Law."

A motion to quash was filed by the defendants in
error, in which the constitutionality of the act, as
well as the sufficiency of the indictment, was chal-
lenged. The motion to quash was sustained; the
trial judge being of opinion that the act was uncon-
stitutional. The State has appealed in error to this
court.

State v. Norvell.

In order to discuss the questions raised on this appeal it becomes necessary to make rather a full quotation of this statute.

The title is "An act to provide an effective system for the keeping of records of all births and deaths in Tennessee, and to provide penalties for the violation of this act." The first four sections of the act provide that the State board of health shall have charge of the registration of births and deaths and keep a record thereof, for the division of the State into registration districts, and for the appointment of officers to carry out the purposes of the act, and like matters.

The sections of the statute particularly drawn in question in this case are as follows:

"Sec. 5. That the body of any person whose death occurs in the State shall not be interred, deposited in a vault or tomb, cremated, or otherwise, disposed of, or removed from or into any registration district, or be temporarily held pending further disposition more than seventy-two hours after death, until a permit for burial, removal, or other disposition thereof shall have been properly issued by the registrar of the district in which the death occurred, and no such burial or removal permit shall be issued by any registrar until a complete and satisfactory certificate of death has been filed with him as hereinafter provided; and provided, further, that when a dead body is brought into a registration district of this State for burial or other disposition, then the transit and removal permit is-

sued in accordance with the law and health regula-
tions of the place where death occurred shall be ac-
cepted by the local registrar of said district as a basis
upon which he shall issue a local burial permit in the
same way as if the death occurred in his district; he
shall plainly enter upon the face of the permit the
fact that it was a body shipped in for interment, and
give the actual place of death; and provided, further,
that a burial permit shall not be required from the
local registrar of the district in which interment is
made when a body is removed for purposes of burial
or other disposition from one district to another in
this State.

"Sec. 6. That stillborn children or those dead at
birth, shall be registered as births and also as deaths,
and a certificate of both birth and death shall be filed
with the local registrar in the usual form and manner.
The certificate of birth to contain in place of the name
of the child the word, 'Stillbirth.' The medical cer-
tificate of the cause of death shall be signed by the at-
tending physician, if any, and shall state the cause of
death as 'Stillborn,' with the cause of the stillbirth,
if known; whether premature birth, and, if born pre-
maturely, the period of uterine gestation in months if
known; and burial or removal permits in the usual
form shall be required. Midwives shall not sign cer-
tificates of death for stillborn children, but such cases,
and stillbirths occurring without attendance of either
physician or midwife, shall be treated as deaths with-
out medical attendance as provided for in section 8 of

this act; and provided, further, that a certificate of birth and death shall not be required for a child that has not advanced to the fifth month of uterogestation.

"Sec. 7.   That the certificate of death shall be of the United States standard form, as approved by the Bureau of Census, and shall contain the following items:

"1.   Place of death, including State, county, civil district, incorporated town or city; if in a city, the ward, street and house number; if in a hospital, or other institution, the name of the same to be given instead of the street and house number; if in an industrial camp, the name of the camp to be given.

"2.   Full name of decedent; if an unnamed child, the surname, preceded 'Unnamed.'

"3.   Sex.

"4.   Color or race—as, white, black (negro or negro descent), Indian, Chinese, Japanese, or other.

"5.   Conjugal condition—as, single, married, widowed or divorced.

"6.   Date of birth, including year, month, and day.

"7.   Age in years, months, and days; if less than one day, hours or minutes.

"8.   Occupation.   The occupation to be reported of any person who had any renumerative employment, women as well as men, stating (a) trade, profession, or particular kind of work; (b) general nature of industry, business, or establishment in which employed (or employer).

"9.   Birthplace—State or foreign country.

"10. Name of father.

"11. Birthplace of father—State or foreign country.

"12. Maiden name of mother.

"13. Birthplace of mother—State or foreign country.

"14. Signature and address of informant.

"15. Official signature of the registrar, with the date when certificate was filed and registered number.

"16. Date of death—year, month, and day.

"17. Statement of medical attendance of deceased; fact and time of death; time last seen alive, and the cause of death, with contributory cause (secondary) or complication, if any, and duration of each; and if attributed to dangerous or unsanitary conditions of employment; signature and address of physician or official making the medical certificate.

"18. Length of residence (for hospitals, institutions, transient, or recent residents) at place of death, and in the State.

"19. Place of burial or removal; date of burial.

"20. Signature and address of undertaker or person acting as such.

"The personal and statistical particulars (item 1 to 13) shall be authenticated by the signature of the informant, who may be any competent person acquainted with the facts.

"The statement of facts relating to the disposition of the body shall be signed by the undertaker or person acting as such. The medical certificate shall be made and signed by the physician, if any, last in at-

tendance on the deceased, who shall specify the time in attendance, the time he last saw the deceased alive, and the hour of the day at which death occurred. And he shall further state the cause of death, so, as to show the course of disease; or sequence of causes resulting in the death, giving first the name of the disease causing death (the primary cause), and the contributory (secondary cause), if any, and the duration of each. Indefinite and unsatisfactory terms indicating only symptoms of disease, or conditions resulting from the disease, which will not be held sufficient for issuing a burial or removal permit, and any certificate containing only such terms as defined by the State registrar shall be returned to the physician for correction and more definite statement. Causes of death, which may be the result of disease, as violence, shall be carefully defined; and if from violence, the means of injury shall be stated, and whether (probably) accidental, suicidal, or homicidal. And in death in hospitals, institutions, or of nonresidents, the physician shall furnish the information required under this head (item 18), and may state where, in his opinion, the disease was contracted.

"Sec. 8. That in case of any death occurring without medical attendance, it shall be the duty of the undertaker to notify the local registrar of such death; and when so notified, the registrar shall inform the local health officer and refer the case to him for immediate investigation and certification prior to issuing the permit: Provided, that when the local health

State v. Norvell.

officer is not a qualified physician, or when there is no such official, and in such cases only, the registrar is authorized to make the certificate and return from the statement of relatives, or other persons having adequate knowledge of the facts; and provided, further, that if the death was caused by unlawful or suspicious means, the registrar shall then refer the case to the coroner for his investigation and certification. And any coroner, whose duty it is to hold an inquest over the body of any deceased person and to make the certificate of death required for a burial permit, shall state in his certificate the name of the disease causing death, or if from external causes (1) the means of death, and (2) whether (probably) accidental, suicidal, or homicidal; and shall, in either case, furnish such information as may be required by the State registrar in order to properly classify the death.

"Sec. 9. That the undertaker, or other person acting as undertaker, shall be responsible for obtaining and filing the certificate of death with the local registrar of the district in which death occurred, and for securing a burial or removal permit prior to any disposition of the body. He shall obtain the personal and statistical particulars required from the person best qualified to supply them, over the signature and address of his informant. He shall then present the certificate to the attending physician, if any, or to the health officer or coroner, as directed by the local registrar, for the medical certificate of the cause of death and other particulars necessary to complete the records, as speci-

State v. Norvell.

fied in section 7 and 8. And he shall then state the facts required relative to the date and place of burial over his signature and with his address and present the completed certificate to the local registrar in order to obtain a permit for burial, removal or other disposition of the body. The undertaker shall deliver the burial permit to the sexton, or person in charge of the place of burial, before interring or otherwise disposing of the body; or shall attach the transit permit containing the corpse, when shipped by any transportation company; said permit to accompany the corpse to its destination where, if within the State of Tennessee, it shall be delivered to the sexton, or to other person in charge of the place of burial.''

Other sections of the statute provide means of registration of births and impose certain duties on the registrars with reference to infectious diseases and impose penalties upon various persons for failure to comply with the provisions of the statute.

There can be no question but that this statute will tend to promote the safety, health, and well-being of the community.

The State of Tennessee maintains a board of health at considerable expense created for the purpose of fighting and endeavoring to control the diseases to which the inhabitants of the State are subject. Perhaps the most important duty of the State board of health is to take steps, in co-operation with local health officers, for the prevention of disease.

·This work cannot be intelligently nor effectively prosecuted without the information which the statute in question is designed to afford. The various local registrars are required to file the certificates procured by the undertakers with the board of health. From this data the board of health can determine the needs of each particular community in the State, and may employ the necessary measures accordingly. These reports will show where tuberculosis prevails, where typhoid predominates, where there is malaria, and, generally speaking, will indicate the hygienic wants of each section of the State. The board of health will thus be able to take the precautions and administer the relief most needed by every community. They will not be left to work in the dark.

Such a system is just as necessary to a successful campaign by the board of health as is information concerning the enemy's movements to the general in command of an army. There can be no specialized or well-directed effort by the board of health without such knowledge.

These reports likewise furnish the board of health with information of contagious diseases, and will enable the board to promptly inaugurate quarantines and undertake other repressive measures to confine the scope of such maladies and prevent epidemics.

Looking to another aspect of the material welfare of the State, no considerable immigration from one State to another now occurs until those coming in have made inquiries as to the health and death rate of the par-

State v. Norvell.

ticular locality to which they intend to move. With the information forthcoming from the operation of the Vital Statistics Law, our board of health will be in a position at all times to reply to such inquiries from those desiring to move into Tennessee.

The provisions of the statute with reference to the registration of births, which are not drawn in question on this appeal, will obviously be most useful.

A permanent record of the births and parentage of all persons born in the State will be of great service in the administration of estates and in fixing the devolution of property. Such matters are often questions of doubt in important litigation. The statute makes certified copies of these records *prima facie* evidence.

The records of births likewise will prove of much value in the enforcement of the laws against child labor. They will make fraud and deception on the part of parents and employers impossible.

We might mention other beneficient offices of the statute, but sufficient has been said to demonstrate that the act is a wholesome exercise of the police power of the State. It tends to promote the health, safety, and happiness of our citizens, and will aid in the enforcement of other laws.

Such being our view of the act, it is obvious that the constitutional objections urged against it are not well made.

It is contended that the statute is in violation of section 8 of article 1 of the Constitution of Tennessee "that no man shall be taken or imprisoned or dis-

seized of his freehold, liberties or privileges, or out-lawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land;" and that it is in violation of section 21 of article 1 of the Constitution of Tennessee "that no man's particular services shall be demanded, or property taken, or applied to public use, without the consent of his representatives, or without just compensation being made therefor."

It is well settled that statutes such as the one under consideration, passed in the exercise of the police power of the State, are not within the prohibition of these sections of the Constitution. *Washington* v. *Mayor of Nashville,* 31 Tenn. (1 Swan.), 180; *Wright* v. *State,* 50 Tenn. (3 Heisk.), 256; *House* v. *Whitis,* 64 Tenn. (5 Bax.), 692; *Theilan* v. *Porter,* 82 Tenn. (14 Lea), 622, 52 Am. Rep., 173; *Henley* v. *State,* 98 Tenn., 665, 41 S. W., 352, 1104, 39 L. R. A., 126; *Webster* v. *State,* 110 Tenn., 491, 82 S. W., 179; *Morrison* v. *State,* 116 Tenn., 534, 95 S. W., 494; *Motlow* v. *State,* 125 Tenn., 547, 145 S. W., 177.

It is also urged that the Vital Statistics Act is in violation of the Fifth Amendment to the Constitution of the United States. In reply to this it is sufficient to say that the powers of the Federal government alone are restricted by the Fifth Amendment to the Federal Constitution. *Kelly* v. *Pittsburg,* 104 U. S., 78, 26 L. Ed., 658. The first ten amendments to the Constitution of the United States do not apply to the

States, but are restrictions upon the power of the Federal government only. This has been held since *Livingston* v. *Moore,* 7 Pet., 469, 8 L. Ed., 751, and *Barron, for Use,* v. *Baltimore,* 7 Pet., 243, 8 L. Ed., 672.

It may be observed that the act in question is not in violation of the Fourteenth Amendment to the Constitution of the United States, any more than it contravenes the sections of the Constitution of Tennessee heretofore quoted. See Federal cases reviewed in *Motlow* v. *State,* supra.

Properly construed, this statute is not unreasonable nor arbitrary in its provision, and it imposes no undue burden on the undertakers.

The prohibition against holding a dead body for more than seventy-two hours is humane as well as sanitary.

In the great majority of cases it will be an easy matter for the undertaker to procure from the family or friends of the deceased the information required by subsections 1-13 of section 7 of the act. The attending physician is required under penalty to add his statement as to the time and cause of death, etc., and the undertaker then completes the certificate with the place of burial or removal, and the date thereof. If the death occurs without medical attendance, the undertaker is required to report to the registrar upon whom certain duties are imposed in such cases by section 8 before the issuance of a burial permit.

When the death certificate is properly made out and filed with the local registrar, the latter is required to issue a permit for burial, which the undertaker turns over to the sexton in charge of the cemetery where the interment takes place. If no sexton is in charge of the burying ground, the undertaker indorses a statement of that fact on the permit and is himself required to return said permit to the registrar.

The statute was not intended to require an impossibility of any one.. Cases will arise in which the undertaker cannot procure the information prescribed for inclusion in the death certificate—as when he is called on to bury strangers and others concerning whom the statutory details are not available. If, after diligent effort, the undertaker is unable to obtain such information, upon a proper showing to this effect, the local registrar will issue a burial permit notwithstanding. It is conceivable, of course, that the attending physician or local registrar or others may prove obstreperous or unmindful of the obligations imposed by the statute, and thus interfere with an orderly burial. In such an event, the undertaker may safely proceed with the disposition of the body. If he is diligent himself to comply with the law, the court will not punish him for the default of others.

These exceptional cases will, no doubt, be covered by the rules which the board of health is expressly authorized to promulgate by section 1 of the statute.

The duties placed upon the undertaker by the statute will put him to some trouble. Organized society is entitled to demand such services of any citizen, however, for the health and safety of all, just as for the same reasons, the property of any citizen may be destroyed, without compensation. The undertaker is in a position to render this service to the State in most cases without special effort. His charges are ordinarily sufficient to cover this additional labor imposed by the statute, if he were entitled to compensation for it.

Statutes very similar to the one under consideration have been upheld in Iowa and Kentucky. *Robinson* v. *Hamilton,* 60 Iowa, 134, 14 N. W., 202, 46 Am. Rep., 63; *Commonwealth* v. *McConnell,* 116 Ky., 358, 76 S. W., 41. See note Ann. Cas., 1912C., 686, where other cases sustaining kindred legislation are collected.

The supreme court of Ohio reached a different conclusion and held a similar statute invalid in *State* v. *Boone,* 84 Ohio St., 346, 95 N. E., 924, 39 L. R. A. (N. S.), 1015, Ann. Cas., 1912C, 683. This case, while it seems to stand alone, may be differentiated from the one before us. It rests on a provision of what is called the "Ordinance of 1787," which was an act of Congress providing for the government of the northwest territory and its future government after it should have been organized into States. The provisions of this ordinance are said to be the fundamental law of Ohio and paramount to the provisions of

137 Tenn.—7

the State Constitution, and it seems that in article 2 of said ordinance it is provided that neither the services nor property of any individual shall·be taken without full compensation, even though "the public exigencies make it necessary." This language appears to be more rigid and comprehensive than the constitutional provisions of Tennessee.

. We do not think that any of the provisions of the statute before us are without the scope of the caption, and accordingly we conclude that the statute does not violate section 17 of article 2 of the Constitution of Tennessee. We have discussed these things orally, and do not find it necessary to include such matters in this opinion. It is sufficient to say that we think all the provisions of the statute are germane to the title.

The objection to the indictment is not well taken.

The judgment of the trial court will accordingly be reversed, and the case remanded for further proceedings.